UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | | |
|---|---|---|
| LAMONICA WHITEHEAD on behalf of T.W., a minor, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | CAUSE NO. 1:14-cv-00045-SLC |
| COMMISSIONER OF SOCIAL SECURITY, sued as Carolyn W. Colvin, Acting Commissioner, | ) ) ) ) | |
| Defendant. | ) ) | |

## OPINION AND ORDER

Plaintiff LaMonica Whitehead, on behalf of her minor son, T.W., appeals to the district court from a final decision of the Commissioner of Social Security ("Commissioner") denying T.W.'s application for Supplemental Security Income ("SSI").[1] (DE 1). For the following reasons, the Commissioner's decision will be REVERSED, and this case will be REMANDED to the Commissioner for further proceedings in accordance with this Opinion and Order.

### I. PROCEDURAL HISTORY

Whitehead applied on T.W.'s behalf for SSI in December 2010, alleging disability as of February 1, 2008 (Administrative Record ("AR") 136-41); the Commissioner denied the application initially and upon reconsideration (AR 72-75, 79-81).[2] A hearing was held on July 12, 2012, before Administrative Law Judge Yvonne K. Stam ("the ALJ"), at which T.W. and

---

[1] All parties have consented to the Magistrate Judge. (DE 13); *see* 28 U.S.C. § 636(c).

[2] This is T.W.'s second application for SSI; he first applied on April 21, 2009, alleging disability as of August 25, 2006, but was denied on initial consideration and did not appeal. (AR 68-71, 144-45).

Whitehead, who were represented by counsel, testified. (AR 41-64). On September 18, 2012, the ALJ rendered an unfavorable decision, concluding that T.W. was not disabled. (AR 20-33). The Appeals Council denied T.W.'s request for review, at which point the ALJ's decision became the final decision of the Commissioner. (AR 1-16).

Whitehead on behalf of T.W. filed a complaint with this Court on February 20, 2014, seeking relief from the Commissioner's final decision. (DE 1). T.W. advances two arguments in this appeal: (1) that the ALJ improperly evaluated the opinion of his treating psychologist, Dr. Flores; and (2) that the ALJ failed to evaluate the credibility of Whitehead's testimony. (DE 18 at 16-20).

## II. FACTUAL BACKGROUND[3]

### A. T.W.'s Testimony at the Hearing

T.W. alleges disability due to attention deficit hyperactivity disorder (ADHD) and bipolar disorder. (DE 18 at 2). He was eleven years old at the time of the hearing and had just completed the fifth grade. (AR 42). He lives with his mother, stepfather, four-year-old brother, and 27-year old female cousin. (AR 51-52).

T.W. testified that he repeatedly got into trouble at school for not listening and for getting angry at others who are "being mean" to him (AR 43-44); twice he got into physical arguments with another student, resulting in suspensions (AR 46-48). He was disappointed in his grades, which were all an A or B, except for an F in health because he forgot to turn in some assignments. (AR 48-49, 55). He attended counseling to help work on his problems, but was not doing so at the time of the hearing. (AR 44).

---

[3] In the interest of brevity, this Opinion recounts only the portions of the 463-page administrative record necessary to the decision.

As to his home life, T.W. reported that he gets along well with his mother and cousin, but often argues with his brother and stepfather. (AR 51-52). He claimed he was independent with his self care, but that sometimes his mother has to remind him to brush his teeth. (AR 50). He has assigned chores, but often his mother has remind him to do them. (AR 50-51). He has no problems riding a bicycle or skateboard and considers himself "[p]retty good" at video games. (AR 49-50).

### B. *Whitehead's Testimony at the Hearing*

Whitehead reported that T.W. takes Vyvanse, Risperdal, and Lexapro. (AR 56). She has to remind him to complete his self care tasks. (AR 59-60). She characterizes T.W. as impulsive; for example, he will run into the street after a ball without checking for cars or lean out of a window to catch a ball. (AR 60). She has no concerns about his motor skills other than that he walks on his toes; for that, he completed physical therapy and does home exercises to stretch his hamstrings. (AR 61).

Whitehead further testified that T.W. would be changing in the fall to an all-boys academy that focuses on children with behavioral and learning issues; she hoped that its smaller classrooms, extended day, and male influence would help him. (AR 54). Whitehead said T.W. spends two to three hours per night on homework, with her checking on him every few minutes (AR 55); she believes there will not be much homework next year because of the academy's extended day program (AR 54). She estimates that his problems completing homework are about the same as his problems staying on task at school. (AR 56). His teacher told her that T.W. does not do so well working in a group because he is a perfectionist and wants to do it his way. (AR 56-57).

3

In addition, Whitehead reported that T.W. was suspended at least five times last year and kicked off the regular bus three times, resulting in his riding the Special Education bus. (AR 57-58). He got in trouble for not being in his seat, taking off his restraint, yelling, and hanging out the window. (AR 58). At home, T.W. tries to stay to himself, but still frequently argues with his brother. (AR 58-59). He plays near, but not with, the neighbor children; he feels other children make fun of him, which upsets him. (AR 61-63).

*C. School Records and Teacher Questionnaires*

Records from Milwaukee Public Schools dated March 10, 2009, to April 5, 2009, indicate that T.W. is a bright boy who usually has his hand up to answer a question. (AR 351). On good days when focused, he does a really good job and helps other students; on bad days, he plays instead of completing assignments, argues with others, and is unable to get back on track. (AR 351). He responds well to one-on-one counseling. (AR 351). He received four incidental referrals: (1) trying to choke another student; (2) leaving class without permission, rolling around on the floor, and not following the teacher's directions (one suspension); (3) refusing to follow directions in class and running in the halls (one suspension); and (4) being unaccompanied in the halls in an inappropriate location (two suspensions). (AR 351).

T.W. was evaluated for suspected special education needs. (AR 352). Whitehead told the evaluator that T.W. was born two months premature, has been very active since age three, and has always been fidgety. (AR 352). He has had mood swings and "anger outbursts" since age five in that he physically fights with other children and screams defiantly when angry. (AR 352). The evaluator wrote that he had limited alertness due to ADHD and demonstrated off-task behavior and impulsiveness. (AR 353). She stated that he needed a small group setting with

4

individualized instruction in behavioral and social skills, as well as access to the special education teacher for support in regular education classes. (AR 354-55). When observed in class, T.W. had difficulty remaining on task during lessons; was frequently distracted by others; and when transitioning between locations, had difficulty with peers, often impulsively instigating problems verbally or physically. (AR 357, 365-66).

In December 2010, T.W.'s fourth grade teacher completed a questionnaire,[4] stating that T.W. is a perfectionist and if things are not going his way, he shuts down and becomes agitated and angry. (AR 214-21). She stated that after taking his medications, T.W. is "calm" and "has more control over his emotions." (AR 220). In the domain of attending and completing tasks, the teacher rated T.W. as having a "serious" problem in working at a reasonable pace and finishing on time; and an "obvious" problem in focusing long enough to finished assigned activity, refocusing to task when necessary, and completing assignments. (AR 216). In the domain of interacting and relating to others, the teacher rated T.W. as having a "serious" problem in expressing anger appropriately and interpreting meaning of facial expression and body language; and an "obvious" problem in playing cooperatively with others, making and keeping friends, seeking attention appropriately, and maintaining appropriate topics of conversation. (AR 217).

In the domain of caring for self, the teacher rated T.W. as having a "serious" problem in appropriately asserting emotional needs and responding appropriately to changes in own mood; and an "obvious" problem in using appropriate coping skills to meet school demands, being

---

[4] The questionnaire asks the teacher to rate the child in key activities on a scale of 1 to 5, with 1 representing "no" problem, 2 a "slight" problem, 3 an "obvious" problem, 4 a "serious" problem, and 5 a "very serious" problem. (*See, e.g.*, AR 215).

patient, and handling frustration appropriately. (AR 219). In the remaining activities on the questionnaire, the teacher indicated that T.W. had either "no" problem or just a "slight" problem. (AR 215-19).

In addition to the questionnaire, T.W.'s fourth grade teacher penned a letter in April 2011 stating that T.W. is a very bright young man who likes to do projects on his own and "does very well on his own." (AR 252). She summarized his strengths as "his patience with his work, his ability to work on his own, and his precision and pride he takes in his work." (AR 252). She emphasized, however, that when off his medications he is a "completely different person," becoming easily distracted, unable to pay attention and pace himself, careless in his work, unable to sit still, and agitated and aggravated with others. (AR 252; *see also* AR 268).

In September 2011, a Fort Wayne Community Schools behavior intervention plan listed T.W.'s strengths as his intelligence; that things come easily to him; and that he enjoys school, has friends, and wants to succeed. (AR 270). His weaknesses were impulsivity; immature social skills; and that he completes his work on his own time if it is of interest to him, but not when asked. (AR 270). Patterns of identified behavior occurring intermittently throughout the day were: (1) impulsivity in that he blurts out at inappropriate times, and (2) being off task. (AR 270). A February 2012 progress report reflected that T.W. was turning in his work more often, but that he tended to become argumentative when he feels he has been wronged; he was at least 75% compliant when asked to do something and more easily redirected. (AR 303). By June 2012, T.W. had increased to at least 80% compliant when asked to do a task. (AR 303).

In June 2012, T.W.'s fifth teacher completed a questionnaire. (AR 283-89). In the domain of attending and completing tasks, she rated him as having a "serious" problem in

organizing his things or school materials; and an "obvious" problem in sustaining attention during play or sports activities, carrying out multi-step instructions, changing from one activity to another without being disruptive, and working without disrupting self or others. (AR 285). In the domain of interacting and relating to others, the teacher rated T.W. as having a "serious" problem in playing cooperatively with children and taking turns in conversation; and an "obvious" problem in making and keeping friends, seeking attention appropriately, expressing anger appropriately, and asking permission appropriately. (AR 286).

In the domain of caring for self, the teacher rated T.W. as having an "obvious" problem in handling frustration appropriately, being patient, responding appropriately to changes in his mood, and using appropriate coping skills to meet school demands. (AR 288). In the domain of moving about and manipulating objects, she indicated he has an "obvious" problem in moving body from one place to another. (AR 287). In the remaining activities on the questionnaire, the teacher indicated that T.W. had either "no" problem or just a "slight" problem. (AR 284-88).

### D. *Summary of the Relevant Medical Evidence*

From November 2008 to March 2009, Cheryl Wenth, a nurse practitioner, saw T.W. at the Children's Medical Group for behavioral problems, including anger, hitting, crying, pacing, and banging his head. (DA 374). He was taking Concerta and Depakote. (AR 374). She noted that his focus had improved, but that his behavioral problems continued. (AR 374). She assessed ADHD behavioral issues, continued his Concerta, and referred him to a psychologist. (AR 374).

In March 2009, Jennifer Winkler, a nurse practitioner, completed a mental status exam. (AR 377). In the prior three weeks, T.W. had experienced an increase in disruptive behavior at

7

school, as well as impulsivity and attention difficulties. (AR 378). He presented as logical, cooperative, and very engaging; he denied suicidal or homicidal ideation. (AR 377). His mood appeared euthymic, and his affect bright; his memory was intact, but his judgment was impulsive. (AR 377). She assigned him a Global Assessment of Functioning ("GAF") score of 60 and provisional diagnoses of mood disorder, not otherwise specified, and ADHD combined type.[5] (AR 377-78). She increased his Concerta and referred him to a therapist. (AR 378).

A month later, Whitehead reported to Nurse Winkler that since the medication changes, she had received daily reports from T.W.'s school that he was disrupting others and was not listening or completing his work. (AR 379). At home, T.W. had appeared hyperactive and unable to follow directions; he also had difficulty sleeping. (AR 379) Nurse Winkler added Adderall to his medication regime. (AR 379).

In July 2009, Michael Madli, Ph.D., a state agency psychologist, reviewed T.W.'s record and completed a childhood disability evaluation form. (AR 394-99). He found that T.W. had severe impairments of ADHD and a mood disorder, but that they did not meet or equal a listing. (AR 394). He opined that T.W. had a "marked" limitation in the domains of attending and

---

[5] GAF scores reflect a clinician's judgment about the individual's overall level of functioning. American Psychiatric Association, *Diagnostic & Statistical Manual of Mental Disorders* 32 (4th ed., Text Rev. 2000). A GAF score of 41 to 50 reflects serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). *Id*. A GAF score of 51 to 60 reflects moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). *Id.*
  "The American Psychiatric Association no longer uses the GAF as a metric." *Spencer v. Colvin*, No. 13-cv-1487, 2015 WL 684545, at *17 n.5 (C.D. Ill. Feb. 17, 2015) (citing *Am. Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders* 16 (5th ed. 2013)). However, the health care providers used GAF scores when assessing T.W., so they are relevant to the ALJ's decision. *See id*.

completing tasks and acquiring and using information;[6] a "less than marked" limitation in the domain of interacting and relating with others; and no limitation in the remaining three domains of health and physical well-being, caring for self, and moving about and manipulating objects. (AR 397).

In October 2010, Dr. Donald Marshall, a psychiatrist, examined T.W. (AR 408). Whitehead told Dr. Marshall that T.W. was less aggressive when on Depakote, but he was otherwise doing well on Adderall. (AR 408).

In November 2010, T.W. was examined by Anthony Flores, Ph.D., for problems with ADHD and impulse control. (AR 401). A mental status exam was normal. (AR 402-03). Dr. Flores concluded that T.W. presented with symptoms consistent with ADHD and that these symptoms impaired function at home and in school, as well as other important areas of life. (AR 406). Dr. Flores listed T.W.'s poor temperament as an obstacle and being personable and having a supportive family as strengths. (AR 406). Dr. Flores diagnosed ADHD and assigned a current GAF of 49 and a past-year GAF of 59. (AR 406). The following month, T.W. returned to both Dr. Flores and Dr. Marshall, reporting that he had more temper problems at school than home. (AR 400, 443).

On December 1, 2010, T.W. was seen in Dr. Hector Perez's office for a follow up on his recent medication. (AR 407). He wrote that T.W. was "doing well" on his medications, was "doing well in school," and that his behavior was "well controlled." (AR 407).

In January 2011, Dr. Flores documented that T.W. reported a good response to Vyvanse.

---

[6] T.W. concedes that the "marked" limitation in acquiring and using information was incorrect. (DE 18 at 5).

9

(AR 449). In February, T.W. told Dr. Flores that he had been involved in a fire when he accidentally turned on a lighter (AR 450); he told Dr. Marshall he was doing "okay" (AR 444).

Also in February 2011, Kari Kennedy, Psy.D., a state agency psychologist, reviewed T.W.'s record and concluded that he did not meet or equal a listing. (AR 417). Dr. Kennedy found a "less than marked" limitation in the domains of attending and completing tasks, interacting and relating to others, and caring for self. (AR 419-20). Dr. Kennedy noted T.W.'s low frustration tolerance, but concluded that his ability to concentrate, attend, and persist and complete tasks in a timely manner was good. (AR 419-20).

That same month, Dr. Revathi Bingi examined T.W. at the request of the Social Security Administration. (AR 411-15). T.W. was initially lethargic and not very cooperative, but at his mother's insistence, he became more alert and cooperative. (AR 411). He presented as bright and able to focus well on the task; he easily understood instructions and did very well on the mental status exam. (AR 411, 415). His mood was euthymic, and his affect varied, as at times he was irritable and uncooperative. (AR 411, 413). He expressed that sometimes he feels anxious, sad, and easily tearful (AR 411); he also was reportedly very impulsive, with a poor ability to focus. (AR 412). His mother stated that when T.W. is asked why he misbehaves, he says that a voice tells him to. (AR 412, 415). Medication, however, was helping T.W. better cope with his problems. (AR 415). Dr. Bingi assigned T.W. a GAF of 50 (with medications) and diagnoses of ADHD (by history) and bipolar disorder, hypomanic, with psychotic features. (AR 415). Dr. Bingi summarized T.W.'s major concerns as his behavior problems and his auditory hallucinations. (AR 415).

In April 2011, Kenneth Neville, Ph.D., reviewed T.W.'s record and concluded that he did

10

not meet or equal a listing. (AR 423). He assigned the same ratings in the six domains as Dr. Kennedy. (AR 425-26).

In May, T.W. told Dr. Marshall that he tends to isolate himself when angry. (AR 450). Later that month, T.W. told Dr. Flores that for about two years he had been hearing voices telling him what to do. (AR 450). In June, T.W. described to Dr. Flores his anger problems at school and that he did not want to listen to authority figures; Dr. Flores noted that T.W.'s impulsivity and temperament exacerbate his ADHD. (AR 451). Also in June, Dr. Marshall documented that T.W. was more hyper and irritable after lowering his dosage of Vyvanse. (AR 442). T.W. continued to see Dr. Flores once a month for the remainder of 2011, reporting trouble at school for not following his teacher's directions, acting out on the bus, and problems maintaining friends. (AR 451, 445).

In December 2011, Dr. Flores completed a mental impairment questionnaire on behalf of T.W. (AR 429-40). He assigned a GAF of 50; diagnoses of ADHD combined type and rule-out bipolar disorder; and a "guarded" prognosis. (DE 429). Dr. Flores wrote that his treatment included skills acquisition for managing temperament, self-governing behaviors, and developing skills to stay on task, but that T.W.'s response to treatment had been "minimal," with "minimal symptom remission." (DE 429). He assigned T.W. a "marked" limitation in the domains of attending and completing tasks and caring for self, but "less than marked" or no limitations in the remaining domains. (DE 433).

In the domain of attending and completing tasks, Dr. Flores wrote that T.W. requires medication and extra reminders to stay on task and perform his responsibilities, and that without medication, he has difficulty concentrating, listening, and managing impulsivity, and is

11

disruptive to others. (DE 433). In the domain of caring for self, Dr. Flores wrote that even with medication, T.W. needs close supervision, repeated redirection, and reminders to be respectful. (DE 433, 437). He stated that T.W. knows right from wrong, but his symptoms impede his ability to conform his behavior accordingly; he also needs reminders to demonstrate appropriate and socially acceptable behavior. (DE 437). Dr. Flores wrote that T.W. engages in risk taking behavior, which increases his propensity for injurious behavior. (DE 437).

In January 2012, T.W. told Dr. Flores that he had grabbed a peer and squeezed him, stating that he can be aggressive with others when they call him names. (AR 447). In February, T.W. expressed that he was angry with a peer. (AR 447). In March, T.W. told Dr. Flores that he had been angry and got into trouble again at school. (AR 447).

### III. STANDARD OF REVIEW

Section 405(g) of the Act grants this Court "the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g); *see* 42 U.S.C. § 1383(c)(3). The Court's task is limited to determining whether the ALJ's factual findings are supported by substantial evidence, which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (citation omitted). The decision will be reversed only if it is not supported by substantial evidence or if the ALJ applied an erroneous legal standard. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).

To determine if substantial evidence exists, the Court reviews the entire administrative record but does not re-weigh the evidence, resolve conflicts, decide questions of credibility, or

12

substitute its judgment for the Commissioner's. *Id.* Rather, if the findings of the Commissioner are supported by substantial evidence, they are conclusive. *Id.* Nonetheless, "substantial evidence" review should not be a simple rubber-stamp of the Commissioner's decision. *Id.*

### IV. ANALYSIS

#### A. *The Law*

To be disabled for purposes of SSI benefits, a child "must have a 'physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.'" *Brindisi ex rel. Brindisi*, 315 F.3d 783, 785 (7th Cir. 2003) (quoting 42 U.S.C. § 1382c(a)(3)(C)(i)). The Social Security Administration has adopted a three-step process for determining whether a child is disabled. *Id.*; 20 C.F.R. § 416.924.

"First, if the child is engaged in substantial gainful activity, his or her claim is denied." *Brindisi*, 315 F.3d at 785 (citing 20 C.F.R. § 416.924(a)). "Second, if the child does not have a medically determinable 'severe' impairment or combination of impairments, then his or her claim is denied." *Id.* (citing 20 C.F.R. § 416.924(a)). "Finally, for a child to be considered disabled, the child's impairment(s) must meet, medically equal, or functionally equal the requirements of a listed impairment in 20 C.F.R. Pt. 404, Subpt. P, App.1." *Id.* (citing 20 C.F.R. § 416.924(a)). "To find an impairment functionally equivalent to a listing, an ALJ must analyze its severity in [six] age-appropriate categories and find an 'extreme' limitation in one category or a 'marked' limitation in two categories." *Id.* (citing 20 C.F.R. § 416.926a(a)).

13

*B. The ALJ's Decision*

On September 18, 2012, the ALJ issued the decision that ultimately became the Commissioner's final decision. (AR 20-33). He found at step one of the three-step analysis that T.W. was a "school-age child" under 20 C.F.R. § 416.926a(g)(2) and had not engaged in substantial gainful activity after the SSI application date. (AR 23). At step two, the ALJ concluded that T.W.'s ADHD and bipolar disorder were severe impairments. (AR 23). The ALJ determined at step three, however, that T.W.'s impairment or combination of impairments were not severe enough to meet or equal a listing. (AR 23-33). Accordingly, T.W.'s claim for SSI was denied. (AR 33).

*C. The ALJ's Discounting of Dr. Flores's Mental Impairment Questionnaire Is Not Supported by Substantial Evidence*

T.W. first argues that the ALJ improperly discounted the findings in the "mental impairment questionnaire" penned by his treating psychologist, Dr. Flores, in December 2011, in which Dr. Flores found that T.W. had a "marked limitation" in the domains of attending and completing tasks and caring for self. For the following reasons, T.W.'s arguments are persuasive.

As explained earlier, to find an impairment functionally equivalent to a listing, an ALJ must analyze its severity in six age-appropriate categories and find one "extreme" limitation or a "marked" limitation in two categories. *Cayton v. Colvin*, No. 3:14-cv-23, 2015 WL 1279741, at \*3 (N.D. Ind. Mar. 19, 2015) (citing 20 C.F.R. § 416.926a(a)). "An 'extreme' limitation occurs when the impairment interferes very seriously with claimant's ability to independently initiate, sustain or complete activities." *Id*. (citing 20 C.F.R. § 416.926a(3)(i)). "A 'marked' limitation is one which interferes seriously with the child's ability to independently initiate, sustain, or

14

complete activities." *Id*. (citing 20 C.F.R. § 416.926a(e)(2)(i)). "'Marked' limitation also means a limitation that is 'more than moderate' but 'less than extreme.'" 20 C.F.R. § 416.926a(e)(2)(i).

Here, the ALJ discounted Dr. Flores's conclusions of "marked" limitations for three reasons, none of which withstand scrutiny. First, the ALJ observed that Dr. Flores states on the mental impairment questionnaire that he sees T.W. with the frequency consistent with accepted medical practice for the patient's condition, but that he did not support this statement by documenting the actual frequency with which he saw T.W. Thus, apparently the ALJ thought that Dr. Flores's assertion concerning frequency of treatment was not "well supported." *See generally Clifford*, 227 F.3d at 870 ("[A] treating physician's opinion regarding the nature and severity of a medical condition is entitled to controlling weight if it is well supported by medical findings and not inconsistent with other substantial evidence in the record.").

As T.W. argues, this reason for discounting Dr. Flores's opinion is weak. Dr. Flores's treatment notes are of record (AR 400-01, 445, 449-51); thus, the ALJ could easily have observed that Dr. Flores saw T.W. for ten, one-hour visits since November 2010. There is no indication that this frequency of treatment is inconsistent with accepted medical practice for T.W.'s type of mental conditions. "An ongoing treatment relationship exists when the claimant saw the medical source frequently enough to be consistent with accepted medical practices for the treatment of the medical condition." *Caudill ex rel. Caudill v. Colvin*, No. 3:12-cv-771, 2014 WL 279672, at *10 (N.D. Ind. Jan. 23, 2014); *c.f. Hudson v. Soc. Sec. Admin.*, No. 3:07-cv-117, 2008 WL 474207, at *6 (N.D. Ind. Feb. 19, 2008) (concluding that a doctor was not a treating source where the only document of record from him was an impairment questionnaire which did not reflect how many times he saw the claimant).

15

Next, the ALJ found Dr. Flores's conclusions of "marked" limitations "not consistent with reporting from the claimant's teachers, as well as consultative evaluations." (AR 26). But the ALJ fails to explain these inconsistencies with any specificity. *See, e.g.*, *Stephenson v. Astrue*, No. 11 C 4429, 2012 WL 5463870, at *9 (N.D. Ill. Nov. 8, 2012) (remanding the ALJ's decision where he makes no attempt to explain how or why a treating physician's opinion was inconsistent with other evidence of record); *cf. Brown v. Astrue*, No. 1:10-cv-450, 2011 WL 5102276, at *9 (N.D. Ind. Oct. 27, 2011) (affirming the ALJ's discounting of a physician's opinion where he stated it was inconsistent with other evidence and then explained that inconsistency by pointing to specific medical evidence).

Moreover, in its own review of the teachers' reports, the Court observes that in the domain of attending and completing tasks, T.W. was rated as having an "obvious" or "serious" problem in four of 13 activities by his fourth grade teacher, and five of 13 activities by his fifth grade teacher. (AR 216, 285). In the domain of caring for self, he was rated as having an "obvious" or "serious" problem in five of 10 categories by his fourth grade teacher and four of 10 categories by his fifth grade teacher. (AR 219). Therefore, at least some of the information on the teachers' reports appears consistent with Dr. Flores's rating of a "marked" limitation. *See Hopgood ex rel. L.G. v. Astrue*, 578 F.3d 696, 699 (7th Cir. 2009) (reversing the ALJ's decision where "the ALJ failed to explain why he did not credit portions of the record that were favorable to [the child], including the teachers' reports that found [he] had serious or obvious problems in this domain"). "An ALJ has the obligation to consider all relevant medical evidence and cannot simply cherry-pick facts that support a finding of non-disability while ignoring evidence that points to a disability finding." *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010).

Likewise, the ALJ never addressed the GAF score of 50 assigned by Dr. Binge, which reflects a "serious" impairment and was consistent with the score assigned by Dr. Flores. Although GAF scores "are intended to be used to make treatment decisions, . . . not as a measure of the extent of an individual's disability," *Martinez v. Astrue*, No. 9 C 3051, 2010 WL 1292491, at *9 (N.D. Ill. Mar. 29, 2010) (citation omitted), this GAF score appears relevant to the ALJ's assertion that Dr. Binge's report was inconsistent with Dr. Flores's opinion *assigning the very same GAF score.  See Bates v. Colvin*, 736 F.3d 1093, 1099 n.3 (7th Cir. 2013) (taking the GAF score in context helped to reveal the ALJ's insufficient consideration of all the evidence presented by the claimant).  Nor did the ALJ explain why Dr. Binge's finding that T.W. suffers from auditory hallucinations was inconsistent with a "marked" limitation.

The ALJ's third reason to discount Dr. Flores's opinion is also problematic.  When assigning a "marked" limitation in the domain of attending and completing tasks, Dr. Flores wrote that T.W. "requires psychotropic medication to stay on task and perform responsibilities" and that without medication he "has trouble concentrating, problems staying on tasks, listening, managing impulsivity and disrupting others."  (AR 433).  From this, the ALJ discounted Dr. Flores's opinion, inferring that he assigned T.W. a "marked" limitation in this domain based, at least in part, on the fact that T.W. requires, and takes, psychotropic medications.  *See Stevenson v. Chater*, 105 F.3d 1151, 1155 (7th Cir. 1997) (acknowledging that an ALJ is entitled to make reasonable inferences from the evidence before him).  Thus, the ALJ discounted the opinion because Dr. Flores discussed T.W.'s abilities when without medication, and an ALJ must assess a claimant's abilities when *on* medication.  *See* 20 C.F.R. §§ 416.924a(b)(9)(i), 416.926a(a)(3).

But again the ALJ cherry-picked the evidence.  Later in the report when assigning T.W. a

17

"marked" limitation in the domain of caring for self, Dr. Flores wrote that even *with* medications, T.W. requires redirecting, reminders to be respectful, and close supervision to complete assigned tasks. (AR 437). The ALJ, however, does not address this later statement when discounting Dr. Flores's opinion, or explain why such level of functioning does not equate to a "marked" limitation. (AR 437). "In coming to [her] decision . . . the ALJ must confront evidence that does not support [her] conclusion and explain why it was rejected." *Kasarsky v. Barnhart*, 335 F.3d 539, 543 (7th Cir. 2003).

For these reasons, the ALJ's discounting of Dr. Flores's opinion of "marked" limitations is not supported by substantial evidence, necessitating the remand of the Commissioner's final decision. On remand, the ALJ is encouraged to "explicitly address the checklist of factors as applied to the medical opinion evidence" in accordance with 20 C.F.R. § 416.927(c). *See Campbell v. Astrue*, 627 F.3d 299, 308 (7th Cir. 2010) (noting that proper consideration of these factors—including that the physician treated the claimant on a monthly basis for fifteen months—may have caused the ALJ to accord greater weight to the treating physician's opinion).

*D. The ALJ Failed to Minimally Articulate Her Assessment of Whitehead's Credibility*

Next, T.W. argues that the ALJ failed to assess the credibility of Whitehead's testimony. This issue, too, needs to be addressed upon remand.

After summarizing the various evidence, the ALJ recited the typical boilerplate credibility finding:

> After considering the evidence of record, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms; however, the statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with finding that the claimant does not have an impairment or combination of impairments that functionally equals the listings for the reasons

18

explained below.

(AR 27). The ALJ, however, never then actually explained why the "statements" were not fully credible. (*See* AR 28-33). As such, the Court cannot trace the ALJ's logic concerning whether some of Whitehead's testimony—for example, that T.W. needs constant attention with homework and to get himself ready for school, his behavioral problems at school and on the bus, and his disregard for his own safety by darting into the street or hanging out a window (AR 25, 30, 32, 55, 57-61)—was credited or discounted by the ALJ. The Court "must be able to trace the ALJ's path of reasoning," *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001), as anything less will result in a remand of the ALJ's decision.

More specifically, "[i]f [Whitehead's] testimony was not credible, the ALJ was obligated to explain the basis for that assessment. If, on the other hand, [Whitehead's] testimony was credible, the ALJ was required to explain why the testimony did not support a finding that [T.W.] was markedly limited in attending and completing tasks [and caring for self]." *Giles ex rel. Giles v. Astrue*, 483 F.3d 483, 488-89 (7th Cir. 2007) (remanding decision where the ALJ recited some parts of the mother's testimony, but failed to make a credibility determination). Accordingly, the ALJ's credibility determination must be revisited upon remand.

## V.  CONCLUSION

For the reasons articulated herein, the decision of the Commissioner is REVERSED, and the case is REMANDED to the Commissioner for further proceedings in accordance with this

Opinion and Order. The Clerk is directed to enter a judgment in favor of the Plaintiff and against the Commissioner.

    SO ORDERED.

    Enter for this 22nd day of July 2015.

                                                  s/ Susan Collins  
                                                  Susan Collins  
                                                  United States Magistrate Judge